# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

EB Holdings II, Inc., et al.,

      Plaintiffs

v.

Illinois National Insurance Company, et al.,

      Defendants

Case No.: 2:20-cv-02248-JAD-DJA

**Order Granting in Part and Denying in Part Cross Motions for Summary Judgment**

[ECF Nos. 263, 274, 279, 290, 307]

This case is about insurance coverage for an investor lawsuit. In the underlying litigation, European investor groups sued EB Holdings II—a holding company for a family of large lead-producing companies—along with its president and subsidiaries. The investors alleged that EB Holdings II and its subsidiaries used illegal price-fixing schemes to indirectly inflate their securities' value on the secondary market and to fraudulently induce investors to purchase them. EB Holdings II sought coverage under its directors-and-officers insurance policies, but its carriers denied coverage based on the primary policy's exclusions. EB Holdings II and its counterpart QXH II sue for reimbursement from the primary and excess insurers, theorizing that they incorrectly applied those exclusions.

All parties now cross move for summary judgment. Primarily at issue are the choice of law that governs the policy, and the application of three policy provisions: the specific-entity exclusion, the public-offering exclusion, and the antitrust sublimit. The specific-entity exclusion excludes coverage for claims involving one of EB Holdings II's subsidiaries. The public-offering exclusion bars coverage for claims involving a public offering of securities by EB Holdings II and the subsequent sale of those securities. And the antitrust sublimit caps coverage

at $5 million for a claim attributable to an antitrust violation.  The insurers argue that all three provisions apply because EB Holdings II is intertwined with the excluded subsidiary and the investor action initially named EB Holdings II's excluded subsidiary as a party, the action arises out of securities listed on an Irish stock exchange, and the price-fixing schemes were central to the underlying investors' suit.

I find that the policy is governed by Texas law.  I also find that the specific-entity exclusion exempts EB Holdings II and that the relevant complaint did not allege that the securities were issued through a public offering, so neither the specific-entity or public-offering exclusion applies.  But this investor suit was an antitrust claim within the policy's meaning, so the $5 million sublimit applies.  I thus grant in part and deny in part each party's motion, and I grant summary judgment for the excess insurers because the sublimit prevents their policies from coming into play.  I then refer what remains of this case to the magistrate judge for a mandatory settlement conference.

## Background

Howard Meyers owns a series of companies that together form one of the world's largest producers of lead.[1]  One of those companies—EB Holdings II—is the Texas-based and Nevada-incorporated holding company for a large European lead-acid battery recycler, Eco Bat Technologies Ltd.[2]  Meyers also owns another independent holding company called QXH II,

---

[1] ECF No. 280-19 at 9; ECF No. 262-4 at ¶ 3.

[2] *See* ECF No. 280-3 at 1–2; *EB Holdings II, Inc. v. Illinois Nat'l Ins. Co.*, 108 F.4th 1211, 1215 (9th Cir. 2024).

which acts as EB Holdings II's counterpart.[3]  Eco-Bat and its subsidiaries in turn operate lead-recycling facilities across the United Kingdom and the European Union.[4]

**A.    EB Holdings II's security holders bring suit.**

The GoldenTree group is a collection of European investment companies owning a particular series of EB Holdings II's securities.  It sued Meyers, EB Holdings II, Eco-Bat, and others in Nevada state court in 2016.  The GoldenTree lawsuit (captioned *GoldenTree v. EB Holdings II*) alleged that EB Holdings II and its subsidiaries had fraudulently induced those investors to purchase overvalued securities.[5]

The investors alleged in their complaint that EB Holdings II sought financing at least twice during the 2000s due to pressure from capital costs.[6]  In 2005, EB Holdings II's corporate predecessor issued securities referred to as the Series 2005 Notes.[7]  And in 2007, EB Holdings II's corporate predecessor entered a €600 million payment-in-kind (PIK) loan with Citibank and Credit Suisse.[8]  Credit Suisse eventually acquired the entire interest in the PIK loan and gave indirect participation interest in it to a Dutch entity known as BOATS Investments.[9]  BOATS created secured notes labeled as Series 97 Notes and which were backed by EB Holdings II's long-term repayment of the PIK loan.[10]  The notes also contained an option to convert the Series

---

[3] *See* ECF No. 280-4 at 1–2.

[4] *See* ECF No. 280-3 at 1–2.

[5] *See generally* ECF No. 262-4 at ¶ 3 (third amended complaint in *GoldenTree v. EB Holdings II*).  This section is a summary of the factual allegation allegations in that complaint.

[6] *Id.* at ¶ 3.

[7] *Id.* at ¶ 71.

[8] *Id.* at ¶ 75.

[9] *Id.*

[10] *Id.*; *EB Holdings II*, 108 F.4th at 1216.

97 Notes into a direct interest in the PIK loan in the event of a default.[11]  The Series 97 Notes were sold to investors, and numerous European investment companies eventually purchased the securities on the secondary market.[12]

The GoldenTree investors alleged that, while the securities were circulating on the secondary market, Eco-Bat participated in a buyer-side cartel with three other lead recyclers to acquire used-battery suppliers across Europe and control scrap metal feedstock prices.[13]  Eco-Bat also participated in another supplier-side cartel to inflate lead prices in Italy.[14]  The cartels allegedly made Eco-Bat appear more profitable because it allowed Eco-Bat to report a higher EBITDA[15] than was otherwise warranted.[16]  In 2012, the European Commission opened an investigation into alleged violations of its competition laws.[17]

The group alleged that Eco-Bat downplayed the seriousness of the European Commission's investigation for several years[18] and only disclosed its true impact in 2015.[19]  EB Holdings II was also facing financial difficulties at this time and entered negotiations with investors to restructure the Series 97 Notes and the PIK loan.[20]  The GoldenTree group collapsed

---

[11] ECF No. 262-4 at ¶¶ 134–37.

[12] *Id.* at ¶ 75.

[13] *Id.* at ¶ 67.

[14] *Id.* at ¶ 66.

[15] EBITDA is a term of art referring to "earnings before interest, taxes, depreciation, and amortization." *See, e.g.*, *EBITDA*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/EBITDA (last visited Feb. 26, 2026).

[16] *Id.* at ¶¶ 79–80.

[17] *Id.* at ¶ 127.

[18] *Id.* at ¶¶ 128–31.

[19] *Id.* at ¶¶ 132–133

[20] *Id.*

the Series 97 Notes into a direct interest in the PIK loan and sought to enforce it against EB Holdings II in 2016.[21]  EB Holdings II refused to pay,[22] so the GoldenTree group sued Meyers, EB Holdings II, Eco-Bat, and others in Nevada state court.[23]

Based on the allegations, the GoldenTree investors asserted claims of fraud in the inducement, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of contract, racketeering, actual and constructive fraudulent transfer, and transfer made by insolvent.[24]  As evidenced by the complaint, they ultimately theorized that the supracompetitive profits from the various cartels inflated Eco-Bat's profitability.[25]  This in turn inflated the value of the Series 97 Notes on the secondary market and fraudulently induced the GoldenTree group to purchase the securities.[26]  They further theorized that Meyers initially sought financing in 2007 to pay off the prior Series 2005 Notes, that Meyers was siphoning assets off to himself, and that he had strung the GoldenTree investors along in negotiations because Eco-Bat had been insolvent since 2012.[27]

---

[21] *Id.* at ¶¶ 134–37.

[22] *Id.* at ¶ 140.

[23] *See id.* at ¶¶ 154–262.  The specific causes of actions were fraud in the inducement, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of contract, racketeering, actual fraudulent transfer, constructive fraudulent transfer, transfer made by insolvent, and alter ego/piercing the corporate veil. *Id.*

[24] *See id.* at ¶¶ 154–262.

[25] *Id.* at ¶ 8.

[26] *Id.* at ¶ 8, 13.

[27] *Id.* at ¶¶ 5, 7, 133.

**B.    EB Holdings II seeks coverage for the GoldenTree lawsuit under its tower of director-and-officer insurance policies.**

Meyers's counterpart holding company, QXH II, maintained a $15 million director-and-officer (D&O) insurance policy with Illinois National Insurance Company (the primary policy) and three excess policies with Illinois National, Continental Casualty Company, and Federal Insurance Company.[28]  Those excess policies provided an additional $25 million in coverage if the primary policy were to be exhausted.[29]  Although QXH II is the named entity on the primary policy, the Illinois National policy also covers Meyers and names EB Holdings II as an additional entity.[30]

Like many D&O policies, this primary policy obligates the carrier to advance reasonable and necessary defense costs (as opposed to a duty to defend) if a complaint alleged that an insured director or officer engaged in a wrongful act.[31]  Relevant here, it excludes claims arising from the "public offering of securities," which are claims

> alleging, arising out of, based upon or attributable to any public offering of securities by the Company, an Outside Entity or an Affiliate or alleging a purchase or sale of such securities subsequent to such public offering . . . .[32]

The "specific entities" exclusion similarly excludes

> any Claim(s) brought by or on behalf of or against (i) the entity(ies) listed below; or (ii) any director, officer, partner, management committee member, member of the Board of Managers or security holder of an entity listed below:
>           Eco Bat Technologies Ltd

---

[28] *See generally* ECF Nos. 262-10, 262-11, 262-12, 262-13.

[29] *See generally id.*

[30] ECF No. 262-10 at 3, 33 (Illinois National primary policy).

[31] *Id.* at 3, 8.

[32] *Id.* at 14.

> Provided, however, this exclusion shall not apply to any other majority owned Subsidiaries of QXH II, Inc or EB Holdings II, Inc.[33]

An endorsement in the primary policy also includes a $5 million sublimit for any antitrust claim, which the policy defines as

> any **Claim** alleging, arising out of, based upon or attributable to, or in any way involving, either directly or indirectly, antitrust violations . . . .[34]

The policy in turn defines "Claim," among other unimplicated definitions, as

> a written demand for monetary or non-monetary relief (including any request to toll or waive any statute of limitations); or
>
> a civil, criminal, administrative, regulatory or arbitration proceeding for monetary or non-monetary relief which is commenced by:
>
>> service of a complaint or similar pleading; or
>>
>> return of an indictment (in the case of a criminal proceeding); or
>>
>> receipt or filing of a notice of charges.[35]

EB Holdings II submitted a claim notice to Illinois National,[36] but the carrier refused coverage based on the public-offering and specific-entity exclusions.[37]  Illinois National reasoned that the suit related to the sale of "publicly traded" securities on an Irish stock market and that EB Holdings II was a security holder of Eco-Bat.[38]  And if there were coverage, it

---

[33] *Id.* at 69.

[34] *Id.* at 35.

[35] *Id.* at 9.

[36] ECF No. 262-16 at 5–6.

[37] *Id.*

[38] *Id.*

7

1    determined that the antitrust sublimit applied because the complaint alleged a scheme based on

2    antitrust violations.[39]

3    **C.    EB Holdings II sues its insurers over the denial of coverage.**

4         The GoldenTree lawsuit and several related cases ultimately settled in 2019 as part of a

5    voluntary bankruptcy proceeding.[40]    EB Holdings II and QXH II now sue its primary and excess

6    policy carriers, alleging that denying coverage for EB Holdings II's $40 million in defense costs

7    was a breach of the insurance agreements and amounted to several torts including bad faith.[41]

8    All parties previously moved for summary judgment before U.S. District Court Judge James C.

9    Mahan, including on the affirmative defense that EB Holdings II made material

10   misrepresentations in its 2015 renewal application for the policy.[42]    Judge Mahan granted Illinois

11   National's motion on that affirmative defense, effectively ending this litigation because the

12   material-misrepresentation defense acted as a complete defense under Nevada law.[43]    But the

13   Ninth Circuit reversed that ruling after concluding that Texas law applies to the material-

14   misrepresentation defense and that questions of material fact precluded summary judgment.[44]

15   This case was later reassigned to me.[45]

16

17   [39] *Id.* at 7.  Illinois National's delineation-of-coverage letter also denied coverage based on the
     exclusion related to wrongful gains, criminal acts, and breach of contract but it does not raise
18   those exclusions in these summary judgment proceedings.  *Id.* at 9–10.

19   [40] ECF No. 280-19 at 12–13.

20   [41] *See* ECF No. 87.  Those specific causes of action are declaratory relief, breach of contract,
     breach of duty of good faith and fair dealing, violation of the Nevada Unfair Claims Settlement
     Practices Act, violation of the Texas Unfair Settlement Practices Act, and violation of the Texas
21   Prompt Payment of Claims Act.  *Id.*

22   [42] *See* ECF No. 212.

     [43] *See id.*

23   [44] *EB Holdings II*, 108 F.4th at 1219.

     [45] ECF No. 258.

**D.     The parties cross-move for summary judgment.**

Illinois National does not renew its material-misrepresentation argument under Texas law but rather moves for summary judgment based on choice of law and its policy's exclusions.[46]  It contends that Nevada law controls the policy because there is no conflict between how Texas and Nevada interpret policies, and New York law governs the tort claims because it made relevant claim-handling decisions there.[47]  And because New York does not recognize these tort causes of action, Illinois National is entitled to summary judgment on the tort claims.[48]

EB Holdings II counters that a choice-of-law analysis is necessary because Texas interprets policies more favorably to an insured than Nevada does.[49]  It contends that Texas law controls the policy because EB Holdings II resides in Texas and drafted and negotiated the policy there.[50]  But no choice-of-law analysis is needed for the tort claims, EB Holdings II theorizes, because Illinois National's argument is underdeveloped.[51]

As to the exclusions, Illinois National argues that the specific-entity exclusion applies because the GoldenTree Group initially named Eco-Bat as a party, Meyers serves as director of Eco-Bat, and EB Holdings II was a security holder of Eco-Bat.[52]  Illinois National works around the exclusion's exemption by interpreting it as applying to subsidiaries of EB Holdings II and not EB Holdings II itself.[53]  Illinois National then argues that the public-offering exclusion also

---

[46] *See generally* ECF No. 274.

[47] ECF No. 275 at 14, 26.

[48] *Id.* at 29–30.

[49] ECF No. 280 at 17–13.

[50] *Id.*

[51] ECF No. 295 at 8.

[52] *Id.* at 17–20.

[53] *Id.* at 20.

applies because the Series 2005 Notes and the Series 97 Notes were securities that were offered to the public and EB Holdings II helped create those securities.[54]  And if neither of those provisions applies, Illinois National reasons, the antitrust sublimit does because the GoldenTree complaint plainly alleges antitrust violations.[55]  Continental joins Illinois National and argues that, based on how Illinois National's policy defines "Claim," a single cause of action in any way involving an antitrust violation triggers the sublimit for the whole lawsuit.[56]  Federal argues that even if none of the exclusions or sublimits applies, $24 million of the defense costs were excessive,[57] so EB Holdings II's $16 million in reasonable defense costs does not reach the $35 million threshold needed to trigger its excess policy.[58]

     For its part, EB Holdings II argues that the specific-entity exclusion does not apply to EB Holdings II because the exclusion does not apply to "any other majority owned Subsidiaries of QXH II, Inc or EB Holdings II, Inc.,"[59] and that language can be reasonably construed as applying to EB Holdings II.[60]  And Texas law requires the court to adopt the insured's interpretation if reasonable.[61]  The public-offering exclusion is likewise inapplicable, EB Holdings II asserts, because the Series 97 Notes weren't "publicly offered" as the term is understood in securities law.[62]  And even if the notes were "publicly offered," they weren't

---

[54] *Id.* at 20–24.

[55] *Id.* at 24–26.

[56] *See* ECF No. 279.

[57] ECF No. 263 at 28.

[58] *Id.*

[59] ECF No. 262-10 at 69.

[60] ECF No. 280 at 23–24.

[61] *Id.*

[62] *Id.*

1  caused or offered "by the company" because BOATS issued the securities, not EB Holdings II.[63]

2  EB Holdings II seemed to initially concede that some causes of action in the GoldenTree

3  complaint were attributable to antitrust violations but now asserts that none are.[64]  And if any

4  causes of action were, EB Holdings II insists that the court must parse the complaint and apply

5  the antitrust sublimit only to those causes of action.[65]  Finally, EB Holdings II asks for summary

6  judgment on several of Illinois National's affirmative defenses.[66]

7  **Discussion**

8      The principal purpose of the summary-judgment procedure is to isolate and dispose of

9  factually unsupported claims or defenses.[67]  The moving party bears the initial responsibility of

10  presenting the basis for its motion and identifying the portions of the record or affidavits that

11  demonstrate the absence of a genuine issue of material fact.[68]  If the moving party satisfies its

12  burden with a properly supported motion, the burden then shifts to the opposing party to present

13  specific facts that show a genuine issue for trial.[69]

14      Who bears the burden of proof on the factual issue in question is critical.  When the party

15  moving for summary judgment would bear the burden of proof at trial, "it must come forward

16  with evidence [that] would entitle it to a directed verdict if the evidence went uncontroverted at

17

18

---

19  [63] *Id.* at 21–23.

20  [64] *Id.* at 35; ECF No. 294 at 11–12.

    [65] ECF No. 280 at 33–35.

21  [66] *See id.* at 29.

22  [67] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

    [68] *Celotex*, 477 U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

23  [69] Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Auvil v. CBS 60 Minutes,* 67 F.3d 816, 819 (9th Cir. 1995).

trial."[70]  Once the moving party establishes the absence of a genuine issue of fact on each issue material to its case, "the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense."[71]  When instead the opposing party would have the burden of proof on a dispositive issue at trial, the moving party doesn't have to produce evidence to negate the opponent's claim; it merely has to point out the evidence that shows an absence of a genuine material factual issue.[72]  The movant need only defeat one element of the claim to garner summary judgment on it because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[73]  "When simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of"—and against—"both  motions before ruling on each of them."[74]

## A.   Texas law governs the Illinois National policy, and Nevada law applies to the tort claims.

As a threshold matter, the parties dispute which state's law governs the primary policy. Illinois National contends that Nevada law applies,[75] while EB Holdings II insists Texas law

---

[70] *C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992) (cleaned up)).

[71] *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991) (cleaned up).

[72] *See, e.g.*, *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 885 (1990); *Celotex*, 477 U.S. at 323–24.

[73] *Celotex*, 477 U.S. at 322.

[74] *Tulalip Tribes of Wash. v. Wash.*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citing *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001)).

[75] ECF No. 275 at 14.

controls.[76]  Federal courts apply the choice-of-law rule of the state that the court sits in.[77]

Nevada applies its own law unless there is a conflict.[78]  So "before undertaking a conflict-of-law

analysis, a court should determine whether a conflict of law actually exists."[79]  A conflict of law

exists when two or more states have a legitimate interest in a particular set of facts in litigation

and the laws of those states differ or conflict.[80]

Texas and Nevada largely share the same bedrock principals for interpreting an insurance

policy, but EB Holdings II identifies two potential conflicts.  First, under Nevada law, "if two

reasonable interpretations [of a policy exclusion] exist, the exclusion is ambiguous, . . . [and] the

court should construe the ambiguity 'against the drafting party and in favor of the insured.'"[81]

EB Holdings II contends that Texas takes that rule a step further and requires the court to adopt

the insured's interpretation "[e]ven if the construction urged by the insurer appears to be more

reasonable or a more accurate reflection of parties' intent."[82]  Second, Texas jurisprudence

requires the court to look "to the factual allegations showing the origin of the damages claimed,

not the legal theories of conclusions alleged."[83]  Neither party cites to a Nevada case with a

similar rule.

---

[76] ECF No. 280 at 17–13.

[77] *EB Holdings II*, 108 F.4th at 1219.

[78] *Tri-Cnty. Equip. & Leasing v. Klinke*, 286 P.3d 593, 595 (Nev. 2012) (citing 15A C.J.S. Conflict of Laws § 30 (2012)) ("If there is no conflict, no further analysis is necessary, and the law of the forum state usually applies.").

[79] *Id.*

[80] *Id.*

[81] *Starr Surplus Lines Ins. Co. v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*, 535 P.3d 254, 267 (Nev. 2023).

[82] ECF No. 295 at 12 (citing *Bitco Gen. Ins. Corp. v. Monroe Guar. Ins. Co.*, 31 F.4th 325, 329 (5th Cir. 2022)).

[83] *Id.* (citing *Ewing Const. Co. v. Amerisure Ins. Co.*, 420 S.W.3d 30, 33 (Tex. 2014)).

Nevada and Texas law also differ on the degree to which extrinsic evidence may be considered to decide coverage issues.  Nevada allows the insured to use extrinsic evidence to prove potential for duty-to-defend coverage under the policy.[84]  Texas, on the other hand, applies a strict "eight-corners" rule, which bars extrinsic evidence in most circumstances.[85]  Neither the Texas Supreme Court nor any Texas state court has applied the "eight-corners" rule to a duty-to-advance-defense-costs case.[86]  Some federal courts have,[87] however, and no party in this case meaningfully addresses whether the rule applies to a duty-to-advance-defense-costs case.  But each party contends that the rule favors them and, consistent with the rule, Illinois National and EB Holdings II both argue at different times that the court should focus on the GoldenTree complaint's allegations.[88]  These differences between Texas and Nevada law are sufficient to present a conflict that triggers the choice-of-law analysis.

---

[84] *Zurich Am. Ins. Co. v. Ironshore Specialty Ins. Co.*, 497 P.3d 625, 631 n.9 (Nev. 2021) (clarifying "that the insured, but not the insurer, is allowed to introduce extrinsic evidence at the duty-to-defend stage").

[85] *Pendergest-Holt v. Certain Underwriters* at *Lloyd's of London*, 600 F.3d 562, 574 (5th Cir. 2010).

[86] *Id.*

[87] *See, e.g.*, *Julio & Sons Co. v. Travelers Cas. & Sur. Co. of Am.*, 591 F. Supp. 2d 651, 659 (S.D.N.Y. 2008) (applying Texas law).

[88] *See, e.g.*, ECF No. 274 at 20–21 ("[T]he Court need only look at the allegations in the GoldenTree Claim to determine whether the exclusion applies. . . ."); ECF No. 300 at 11 (applying the eight-corners rule "actually support[s] Illinois National's approach to interpreting the relevant Policy provisions because Illinois National has rightly argued that only the Policy and GoldenTree Claim allegations are relevant to the Court's coverage assessment and that Plaintiffs' extrinsic evidence should be excluded"); ECF No. 307 at 10 ("This Court does not need to look beyond the 'eight corners' in order to grant summary judgment for Plaintiffs.").

### 1.    *Restatement § 188 favors applying Texas law to the Illinois National Policy.*

Nevada applies Restatement (Second) of Conflict of Laws § 188 to decide choice-of-law issues in disputes involving contracts that lack a choice-of-law provision.[89]  That test considers "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties."[90]  Judge Mahan previously applied this test and decided that Nevada law applied to the material-misrepresentation defense.[91]

The Ninth Circuit reversed and held that Texas law applied to that defense.[92]  It reasoned that the place of contracting and the place of negotiation was Texas, and thus the first and second factors of the choice-of-law analysis favor Texas law.[93]  For the same reasons, domicile (the fifth factor) was held to favor Texas because the insurers' principal places of business were either in Texas or a state other than Nevada.[94]  The location of the subject matter (fourth factor) favored no location because EB Holdings II received world-wide coverage.[95]  Only the place of performance (third factor) favored Nevada because the underlying litigation happened in

---

[89] *EB Holdings II*, 108 F.4th at 1219–20.

[90] *Id.* at 1220.

[91] *See* ECF No. 212.

[92] *EB Holdings II*, 108 F.4th 1211, 1222 (9th Cir. 2024) ("[W]e conclude that § 188's substantial relationship test requires the application of Texas law to the affirmative defense of material misrepresentation.").

[93] *Id.*

[94] *Id.*

[95] *Id.*

Nevada.[96]  The Ninth Circuit reserved the remaining choice-of-law questions for the district court on remand.[97]

Now taking up those questions on remand, I conclude that Texas law applies.  Nothing the insurers offer materially distinguishes the rest of the Illinois National policy from the Ninth Circuit's analysis in *EB Holdings II*.  The place of contracting, place of negotiation, and domicile factors favor Texas because EB Holdings II is based in Texas, in-person meetings regarding the policy took place in Texas, and the employees of both companies who negotiated the policy were based in Texas.[98]  Illinois National places significant weight on the place of performance, contending that factor favors applying Nevada law because Nevada is where EB Holdings II incurred its defense costs.[99]  But that argument is dubious because the policy afforded world-wide coverage, so there was potential performance anywhere in the world and not just in Nevada.[100]  Even factoring in that Nevada is where EB Holdings II incurred these charges does not tip the analysis in favor of applying Nevada law because the only remaining factor, location of the subject matter, is neutral.  EB Holdings II, QXH II, and its subsidiaries are incorporated in and have assets in many states,[101] so nothing in the parties' justified expectations favored Nevada or Texas over any other state.  So I conclude that Texas law applies to the Illinois National Policy.

---

[96] *Id.*

[97] *Id.* at 1222–23.

[98] ECF No. 280-18 (8:20-10:2, 23:5-16) (Depo. of Jennifer Shelvin); ECF No. 280-24 (17:5-14, 18:20-19:15, 32:7-33:4) (Depo. of Melissa Sommers); ECF No. 280-25; ECF No. 280-26; ECF No. 280-27; ECF No. 280-28.

[99] ECF No. 288 at 15.

[100] *See* ECF No. 262-10 at 8.

[101] *See* ECF No. 262-9 at 3–4.

### 2. *Illinois National has not shown that Restatement § 145 favors applying New York law to EB Holdings II's tort claims.*

Illinois National contends that New York law applies to EB Holdings II's tort claims,[102] while EB Holdings II insists that either Texas or Nevada law applies.[103]  Both parties agree that New York law conflicts with both Texas and Nevada law because New York either does not recognize an independent tort action for bad-faith denial of insurance coverage or significantly limits it.[104]

Nevada applies Restatement § 145, known as the most-significant-relationship test, for choice of law in tort claims.[105]  Courts generally consider the states' policies, the parties' expectations, and how easily the states' laws could be applied.[106]  The state with the most significant relationship is determined by looking to (1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties, and (4) the place where the relationship, if any, between the parties is centered.[107]

---

[102] ECF No. 275 at 20.

[103] ECF No. 295 at 28–30.

[104] ECF No. 275 at 20; ECF No. 295 at 30.

[105] *Gen. Motors Corp. v. Eighth Jud. Dist. Ct. of State of Nev. ex rel. Cnty. of Clark*, 134 P.3d 111, 116–19 (Nev. 2006).

[106] *See id.* (citing Restatement (Second) of Conflict of Laws § 6 (1971)).

[107] Restatement (Second) of Conflict of Laws § 145 (1971); *see also Gen. Motors Corp.*, 134 P.3d at 119 ("We now hold that in Nevada, section 145 of the Second Restatement governs choice-of-law issues in tort actions unless the Second Restatement contains a section that specifically addresses a particular tort.").

Illinois National's primary argument is that it made relevant claim-handling decisions in New York, and it cites to three cases that it contends support its argument.[108]  But this argument is insufficiently developed.  In its opening brief, Illinois National offered no evidence in support and provides no context on what specific decisions were made in New York.[109]  When pressed on this point, Illinois National cited to its coverage-decision letters in its reply brief.[110]  But the only nexus to New York that can be gleaned from those letters is that two New York-based employees e-mailed the letters, and the letter had a New York address on it, among other non-New York addresses.[111]  Without more, I find that Illinois National has failed to carry its burden on the choice-of-law argument.  And because the application of New York law was the essential foundation of Illinois National's motion for summary judgment on the tort claims,[112] I deny its motion on those claims.

## B.    EB Holdings II has met its initial burden of showing, absent any exclusions, that the policy covers the dispute.

Turning to the policy, the insured has the initial burden of showing that the policy covered the loss.[113]  If a single cause of action is within the policy's coverage, then Texas law obligates the insurer to defend the insured.[114]  "This rule is applied liberally, with any doubts

---

[108] ECF No. 275 at 27–30 (citing *Vignola v. Gilman*, 854 F. Supp. 2d 883 (D. Nev. 2012); *Ohio Sec. Ins. Co. v. Hi-Tech Aggregate, LLC*, 746 F. Supp. 3d 947, 953 (D. Nev. 2024); and *Lange v. Penn Mut. Life Ins. Co.*, 843 F.2d 1175, 1179 (9th Cir. 1988)).

[109] *See generally* ECF No. 275.

[110] ECF No. 300 at 22 (citing ECF Nos. 262-14, 262-15, 262-16).

[111] *See* ECF Nos. 262-14, 262-15, 262-16.

[112] *See generally id.*

[113] *Penn-Am. Ins. Co. v. Tarango Trucking, LLC*, 30 F.4th 440, 444 (5th Cir. 2022).

[114] *Id.*

resolved in favor of the insured."[115]  "[C]ourts look to the factual allegations showing the origin of the damages claimed, not to the legal theories or conclusions alleged."[116]

"If the insured carries its burden, it shifts to the insurer to show 'that the plain language of a policy exclusion or limitation allows the insurer to avoid coverage of all claims, also within the confines of the eight corners rule.'"[117]  In interpreting the policy and its exclusions, the primary concern is to "[e]ffectuat[e] the parties' expressed intent."[118]  An exclusion with unambiguous language must be enforced as written.[119]  But if a policy is susceptible to more than one reasonable interpretation, "any doubts regarding coverage are resolved in favor of the insured."[120]  Similarly, if an exclusion is subject to more than one reasonable construction, the court must "adopt the interpretation urged by the insured as long as it is not unreasonable and even if the insurer's interpretation 'appears to be more reasonable or a more accurate reflection of the parties' intent.'"[121]

Setting aside any exclusions, the Illinois National primary policy plainly covered the conduct at issue.  No party seems to deny that the GoldenTree complaint alleged that Meyers and EB Holdings II engaged in wrongful conduct within the policy's meaning.  Illinois National rather challenges only the timeliness of EB Holdings II's notice of a claim.[122]

---

[115] *Id.*

[116] *Id.*

[117] *Id.*

[118] *Pendergest-Holt*, 600 F.3d at 569.

[119] *In re TransTexas Gas Corp.*, 597 F.3d 298, 309 (5th Cir. 2010).

[120] *Penn-Am. Ins. Co.*, 30 F.4th at 444.

[121] *Id.* at 444–45.

[122] ECF No. 288 at 6.

"A 'claims-made' policy covers occurrences [that] may give rise to a claim that comes to the attention of the insured and is made known to the insurer during the policy period."[123]  A claims-made policy "require[s] the insured to give the insurer prompt notice of a potential claim against the insured."[124]  The primary policy's notice provision required EB Holdings II or another insured to give notice if a claim was made against it or it became aware of circumstances that may reasonably be expected to give rise to a "Claim"—which the policy defines as a written demand or civil proceeding.[125]

Illinois National theorizes that EB Holdings II's claim accrued before the policy period because EB Holdings II was negotiating with the GoldenTree group before the policy period.[126]  In support, Illinois National points to two paragraphs in EB Holdings II's complaint in a different lawsuit against the GoldenTree group in which EB Holdings II alleged it had been negotiating with the GoldenTree group about restructuring the PIK Loan in 2014 and 2015.[127]  But those paragraphs do not show that EB Holdings II should have reasonably understood that those negotiations would ripen into a claim at that point or that it received some form of written demand.[128]  So I find that EB Holdings II has met its initial burden of showing coverage, and the

---

[123] *Yancey v. Floyd W. & Co.*, 755 S.W.2d 914, 918 (Tex. App. 1988); *St. Paul Surplus Lines Ins. Co. v. Davis Gulf Coast, Inc.*, 2012 WL 2160445, at *5 (S.D. Tex. June 13, 2012) ("In a claims made policy, coverage is triggered when an insured becomes aware of either claims against the insured or occurrences that might give rise to a claim against the insured and notifies the insurer of such a claim or occurrence during the policy period."); *Int'l Ins. Co. v. RSR Corp.*, 148 F. App'x 226, 231 (5th Cir. 2005) ("Claims-made policies cover the insured in respect to an occurrence when the claim based thereon is made against the insured, and the insured notifies the insurer, during the policy period.").

[124] *Int'l Ins. Co.*, 148 F. App'x at 231.

[125] ECF No. 262-10 at 9, 18.

[126] ECF No. 275 at 3.

[127] ECF No. 288 at 6, 31 (citing ECF No. 262-5 at ¶¶ 33–34).

[128] *See* ECF No. 262-5 at ¶¶ 33–34.

burden shifts to Illinois National to show that an exclusion applies that avoids or limits coverage. Illinois National offers three: the public-offering exclusion, the specific-entity exclusion, and the antitrust sublimit.

**C.    The public-offering exclusion does not apply because the GoldenTree complaint did not allege a public offering.**

The public-offering exclusion bars coverage for any claim "alleging, arising out of, based upon or attributable to any public offering of securities by the Company" or "alleging a purchase or sale of such securities subsequent to such public offering."[129]  The parties dispute almost every aspect of this exclusion.  But Illinois National's position that this exclusion applies and bars coverage relies on a too-broad interpretation of the exclusion's key term "public offering."

*1.    The public-offering exclusion does not supply a definition of its key term.*

The policy does not define "public offering,"[130] and Illinois National interprets this term to mean any offering of a security to the public.  In its coverage-denial letter, Illinois National took the position that this exclusion applied because the GoldenTree complaint alleged that EB Holdings II participated in issuing the Series 2005 Notes and the Series 97 Notes, which it characterized as publicly traded securities.[131]  Illinois National returns to that argument here, contending that the court should apply the Securities Act's definition of "offering," which is "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value."[132]  And because the complaint mentioned prior Series 2005 Notes and Series

---

[129] ECF No. 262-10 at 14.

[130] *See generally id.*

[131] ECF No. 262-16 at 6.

[132] ECF No. 288 at 28 (citing 15 U.S.C. § 77b).

97 Notes, which were sold to investors, Illinois National contends that the securities were publicly offered so it rightly applied this exclusion.[133]

EB Holdings II disagrees.  It asserts that "public offering" is a term of art referring to a "public offering" under the Securities Act and United States Supreme Court precedent, and it refers to the sale of securities to a very large or unlimited number of potentially unsophisticated investors and generally requires an issuer to file a registration statement and issue a prospectus.[134]  On the other hand, soliciting sophisticated investors is generally considered a private offering.[135]  EB Holdings II argues that the complaint was silent as to how BOATS offered the securities, so Texas's eight-corners rule prevents the public-offering exclusion from triggering.[136]  And if the court were to admit extrinsic evidence, the BOATS issue memorandum for the Series 97 Notes shows that BOATS did not publicly offer the Series 97 Notes;  rather it privately offered them to sophisticated investors.[137]

### 2.    The term refers to a "public offering" under the Securities Act and _S.E.C. v. Ralston Purina_.

Texas law holds that undefined policy language should be given its plain, ordinary meaning unless something else in the policy shows that the parties intended a different, technical

---

[133] _Id._ at 28–29.

[134] ECF No. 280 at 23–24.

[135] _Id._

[136] _Id._ at 24; ECF No. 307-1 at 10.  In response to some of Illinois National's argument, EB Holdings II filed a motion for leave to file a surreply that more fully addressed Texas's "eight-corners" rule relation to this case.  _See_ ECF No. 307.  District courts have discretion on whether to permit surreplies.  _Atchison, Topeka & Santa Fe Ry. v. Hercules, Inc._, 146 F.3d 1071, 1074 (9th Cir. 1998) ("[I]t is well established that '[d]istrict courts have inherent power to control their docket.'").  I find that the information is germane, so I grant that motion and consider the surreply's arguments.

[137] ECF No. 280 at 23–24.

meaning.[138]  Courts applying Texas law consider "dictionary definitions and then consider the term's usage in other statutes, court decisions, and similar authorities."[139]  When construing an insurance policy, a court can generally consider "surrounding circumstances that inform, rather than vary from or contradict, the contract text."[140]

The parties dispute what exact term needs to be defined—"public offering" or merely "offering."  Illinois National urges the court to apply the Securities Act's definition of "offering" alone.  But Texas encourages courts to give each word in a policy meaning,[141] and applying Illinois National's proposed definition would give meaning only to the word "offering," ignoring the word "public."  The word "public" also appears to act as a qualifier here because the next paragraph in the policy uses the language "any purchase or sale of securities," which better reflects Illinois National's interpretation.[142]  While the policy drafters certainly could have used that language, they apparently chose not to here.  And applying Texas's rules of policy interpretation to "public offering" favors EB Holdings II's interpretation.

Dictionary definitions support EB Holdings II's interpretation of "public offering" as a term of art.  Merriam-Webster defines a public offering as "an offering of corporate securities to the general public or to potential purchasers whose level of knowledge or access to information

---

[138] *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 831 (Tex. 2009); *Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 99 F.3d 695, 700 (5th Cir. 1996).

[139] *Pharr-San Juan-Alamo Indep. Sch. Dist. v. Texas Pol. Subdivisions Prop./Cas. Joint Self Ins. Fund*, 642 S.W.3d 466, 474 (Tex. 2022).

[140] *Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011).

[141] *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998) ("We must read all parts of the contract together . . . striving to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative.").

[142] ECF No. 262-10 at 14.

about the securities is dependent upon the disclosures of the corporation" and notes that "[p]ublic offerings are subject to the requirements of the Securities Act of 1933 for filing a registration statement before the offering can take place."[143]  Collins dictionary similarly defines "public offering" as "a sale of a new issue of securities to the general public through a managing underwriter: required to be registered with the Securities and Exchange Commission."[144]  In contrast, Merriam-Webster defines a private offering as "the sale of an issue of securities directly by the issuer to one or a few large investors without any public offering."[145]

The Securities Act and judicial decisions similarly favor EB Holdings II's interpretation of the term.  Section 4(a)(2) of the Securities Act recognizes a "public offering" as a term of art and exempts "transactions by an issuer not involving any public offering" from much of securities regulation.[146]  While the Securities Act does not define "public offering" itself, the Supreme Court defined the term in *Securities and Exchange Commission v. Ralston Purina Co.* as an offering made to "the particular class of persons" who "need the protection of the Act."[147]  The *Ralston Purina* court also noted that an offering made "to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering.'"[148]  And other courts

---

[143] *See Public Offering*, Merriam-Webster.com, https://www.merriam-webster.com/legal/public%20offering (last visited Feb. 26, 2026).

[144] *See Public Offering*, CollinsDictionary.com, https://www.collinsdictionary.com/dictionary/english/public-offering (last visited Feb. 26, 2026).  Dictionary.com defines it identically.  *See Public Offering*, Dictionary.com, https://www.dictionary.com/browse/public-offering (last visited Feb. 26, 2026).

[145] *See Private Offering*, Merriam-Webster.com, https://www.merriam-webster.com/legal/private%20offering (last visited Feb. 26, 2026).

[146] 15 U.S.C § 77d(a)(2).

[147] *S.E.C. v. Ralston Purina Co.*, 346 U.S. 119, 125 (1953).

[148] *Id.*

have used *Ralston Purina* and its progeny to define the term "public offering" and to determine whether an offering met that definition.[149]

It is also reasonable that a policy would exempt public offerings but not private ones. "Registered securities offerings can be expensive, time consuming, and burdensome,"[150] and a public offering could expose the issuer to additional liability and regulation.[151] So given that EB Holdings II's interpretation is supported and reasonable, I find that the term "public offering" refers to a "public offering" under securities law and as defined in *Ralston Purina*.

### 3. The public-offering exclusion does not apply because the GoldenTree complaint did not allege that the securities were publicly offered.

*Ralston Purina* defines a "public offering" as one made to investors who require the protection of the Securities Act.[152] Courts make that determination based on "(1) the number of offerees, (2) the sophistication of the offerees, (3) the size and manner of the offering, and (4) the

---

[149] *See e.g.*, *West v. Innotrac Corp.*, 463 F. Supp. 2d 1169, 1177 (D. Nev. 2006) ("Rather, the appropriate inquiry is to apply the *Ralston Purina* test to the facts at bar and determine whether the grant of stock options under the plan was a public offering necessitating registration and the production of a prospectus.").

[150] *S.E.C. v. Bronson*, 14 F. Supp. 3d 402, 409 (S.D.N.Y. 2014).

[151] *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, 2004 WL 574665, at *13 (N.D. Ill. Mar. 22, 2004) ("These minimal proof requirements create extensive liability for issuers and those involved in the preparation and dissemination of the registration statements filed in the context of a public offering."); George S. Georgiev, *The Breakdown of the Public-Private Divide in Securities Law: Causes, Consequences, and Reforms*, 18 N.Y.U. J.L. & Bus. 221, 237–38 (2021) ("Issuers could avoid registration—and the bulk of securities regulation—as long as they conducted a small offering, to a limited number of sophisticated investors, and without engaging in general solicitation and general advertising."); *Krim v. pcOrder.com*, 2002 WL 1185913, at *4 (W.D. Tex. Apr. 12, 2002) ("This affirmative duty to disclose is stronger in the context of a public offering."); *Flake v. Hoskins*, 55 F. Supp. 2d 1196, 1228 (D. Kan. 1999) ("Generally, only public offerings need be registered. The Court therefore limited Section 12(2) to cover only public offerings."); *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1299 (2d Cir. 1973) ("Since the public interest in private offerings is less than that in public offerings, the duties imposed upon directors in private offerings were intended to be correspondingly less stringent.").

[152] *Ralston Purina*, 346 U.S. at 125.

relationship of the offerees to the issuer."[153]  "[T]hese factors are aimed at the ultimate question of whether the offerees . . . because of their sophistication and access to skilled advice" can "fend for themselves."[154]

But it is not possible to conclude that the GoldenTree case involved a public offering under this analysis because the GoldenTree complaint is silent as to how BOATS initially offered the Series 97 Notes and Series 2005 Notes.[155]  It recounts only that BOATS offered and sold the securities to investors, an act that may be carried out through a public or private offering.[156]  The complaint does not even reference that the securities were listed on an Irish stock exchange, which—while not dispositive—was Illinois National's original basis for denying the claim.[157]  Rather, the GoldenTree complaint focuses on the securities' sale on the secondary market.[158]  The insurer has the burden of showing that an exclusion applies within the evidentiary confines of Texas's eight-corners rule,[159] and on this record, Illinois National cannot meet that burden and show that the public-offering exclusion applies.[160]

---

[153] *S.E.C. v. Murphy*, 626 F.2d 633, 644–45 (9th Cir. 1980); *Doran v. Petroleum Mgmt. Corp.*, 545 F.2d 893, 900 (5th Cir. 1977) ("The relevant factors include the number of offerees and their relationship to each other and the issuer, the number of units offered, the size of the offering, and the manner of the offering.").

[154] *Bayoud v. Ballard*, 404 F. Supp. 417, 423 (N.D. Tex. 1975).

[155] *See generally* ECF No. 262-4.

[156] *Id.* at ¶ 75.

[157] *See generally id.*

[158] *See generally id.* at ¶¶ 77–100.

[159] *Penn-Am. Ins. Co.*, 30 F.4th at 444.

[160] Even if the court did not apply the eight-corners rule, the available extrinsic evidence does not alter this conclusion.  ECF No. 280 at 24.  EB Holdings II bolsters its assertion that the GoldenTree case did not involve a "public offering" by arguing that if the court were to look beyond the complaint, extrinsic evidence suggests that the Series 97 Notes were not publicly offered.  It points to the BOATS memorandum that accompanied the issuing of the Series 97 Notes.  *Id.*  Illinois National objects, arguing that the court should consider only the complaint's

**D.      The specific-entity exclusion does not affect EB Holdings II's coverage.**

Illinois National next argues that the specific-entity exclusion precludes coverage for EB Holdings II.[161]  That exclusion applies to claims "brought by or on behalf of or against [Eco-Bat] or any director, officer, partner, management committee member, member of the Board of Managers or security holder of [Eco-Bat]."[162]  But the specific-entity exclusion expressly does not "apply to any other majority owned Subsidiaries of QXH II, Inc or EB Holdings II, Inc."[163]  Among other things, the parties dispute who exactly this carve-out covers.

---

allegations because of the exclusion's language stating that "allegat[ions] . . . attributable to any public offering" trigger the exclusion or alternatively Texas's eight-corners rule.  ECF No. 300 ("Plaintiffs have impermissibly urged the Court to consider the BOATS Memorandum and other external documents to support their coverage positions."); ECF No. 308 at 3–5.

The BOATS memo required potential purchasers of the Series 97 Notes to be "either (i) a 'qualified investor,' for the purposes of the EU Prospectus Directive or (ii) a sophisticated investor."  ECF No. 262-8 at 36.  Generally, "a limited distribution to highly sophisticated investors, rather than a general distribution to the public, is not a public offering."  *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1090–91 (9th Cir. 2010).  And offerings "made via private placement memoranda to sophisticated investors" are similarly "not public offerings."  *See, e.g.*, *In re Fisker Auto. Holdings, Inc. S'holder Litig.*, 2015 WL 6039690, at *12 (D. Del. Oct. 15, 2015).  Although the "qualified investor" language is not itself dispositive, it strongly indicates that these securities were not offered to those needing the protection of the Securities Act.

While the Series 97 Notes were apparently offered in Ireland and not the United States, ECF No. 262-14, neither party attempts to wade into European securities law to argue whether the Series 97 Notes were a public offering under the law of that jurisdiction and whether that would trigger the exclusion.  It appears that the BOATS memo limited sales to "qualified investors," which would seemingly exempt the offering from the prospectus requirement imposed by the Europeans Prospectus Regulation.  *See* Prospectus Regulation (EU) 2017/1129, 2017 O.J. (L 166) 12 (EU).  But I decline to further explore this reasoning absent briefing.  *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) ("In our adversarial system of adjudication, we follow the principle of party presentation.").  So even with extrinsic evidence, Illinois National has not met its burden of showing that the GoldenTree complaint alleged a public offering within the policy's meaning, so the public-offering exclusion does not apply.

[161] ECF No. 275 at 16–20.

[162] ECF No. 262-10 at 69.

[163] *Id.*

Illinois National argues that the carve-out is for subsidiaries of either QXH II or EB Holdings II.[164]  So, in Illinois National's construction, this exclusion bars coverage because EB Holdings II's entanglement with Eco-Bat was sufficient to trigger the exclusion[165] and the carve-out does not apply to EB Holdings II itself, just its subsidiaries.[166]  EB Holdings II insists that the exemption applies to "Subsidiaries of QXH II, Inc" and "EB Holdings II" itself, so the specific-entity exclusion does not affect coverage for EB Holdings II.[167]

EB Holdings II further argues that Illinois National's interpretation is nonsensical because EB Holdings II "did not have any 'Subsidiaries' as defined in the Policy."[168]  The policy defines "Subsidiary" to mean only an entity "of which the Named Entity has or had Management Control,"[169] and the only "Named Entity" in the policy is QXH II.[170]  EB Holdings II is not a named entity in the policy, but rather is designated as an "additional entity" on the policy.[171]  Because QXH II and EB Holdings II are separate and distinct entities and QXH II did not have any management control of EB Holdings II's subsidiaries,[172] EB Holdings II has no subsidiaries as the policy defines that term.

---

[164] ECF No. 275 at 20.

[165] *Id.* at 14–20.  Illinois National asserts several theories on why the specific-entity exclusion applies: The GoldenTree complaint initially named Eco-Bat as a party, Meyer serves as director of Eco-Bat, and EB Holdings was a security holder of Eco-Bat.  *Id.*  But I do not reach those arguments because, as explained *infra* at 29, I conclude that EB Holdings II is exempted from this exclusion.

[166] ECF No. 275 at 20.

[167] ECF No. 280 at 27.

[168] *Id.*

[169] *Id.* (citing ECF No. 262-10 at 59–60).

[170] *Id.* (citing ECF No. 262-10 at 3, 11).

[171] ECF No. 262-10 at 3, 33.

[172] *See* ECF No. 280-4 at 1–2.

Illinois National argues that EB Holdings II's interpretation violates other contract-construction tenets. It suggests that because EB Holdings II was the only "security holder" of Eco-Bat that was insured on the policy,[173] the specific-entity exclusion must apply to EB Holdings II, or it would make the reference to "security holder" of Eco-Bat meaningless.[174] The insurer also asserts that EB Holdings II's interpretation reads the word "other" out of the carve-out, which states that it "appl[ies] to any *other* majority owned Subsidiaries."[175] Illinois National assigns significance to the word "other" because Eco-Bat "was a majority owned subsidiary of [EB Holdings II] but was not a majority owned subsidiary of QXH" II, so there were no "other" subsidiaries of QXH II.[176]

Both readings appear reasonable on their face, but Texas law requires courts to adopt an insured's reasonable interpretation "[e]ven if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of parties' intent."[177] And a "term's common-law meaning will not override the definition given to a contractual term by the contracting parties."[178] Given that the insured's reasonable interpretation controls and the policy's definition of subsidiary supports EB Holdings II's interpretation, I adopt EB Holdings II's construction of the exclusion. I thus find that EB Holdings II is exempted from its reach and conclude that the specific-entity exclusion does not preclude coverage for EB Holdings II.

---

[173] ECF No. 300 at 18.

[174] *Id.*

[175] ECF No. 275 at 20.

[176] *Id.*

[177] ECF No. 295 at 12 (citing *Bitco*, 31 F.4th at 325).

[178] *TEC Olmos, LLC v. ConocoPhillips Co.*, 555 S.W.3d 176, 181 (Tex. App. 2018).

**E.    The primary policy's antitrust sublimit caps coverage at $5 million.**

Even if coverage does exist, the insurers assert that their coverage obligation cannot exceed $5 million based on the antitrust sublimit of liability contained in the policy's antitrust-coverage endorsement.  This endorsement states that it amends the D&O coverage section of the policy and "forms part of" the original policy.[179]  The sublimit caps the aggregate limit of "the Insurer's liability for all Loss under this D&O Coverage Section arising from all Antitrust Claims" at $5 million.[180]  The endorsement defines "antitrust claim" as "any Claim alleging, arising out of, based upon or attributable to, or in any way involving, either directly or indirectly, antitrust violations."[181]

The parties dispute how this endorsement affects coverage in the original policy, what "antitrust claim" means, and whether the sublimit applies to the whole policy or just the causes of action related to antitrust violations.  EB Holdings II argues that the endorsement does not affect coverage in the original policy, that the "antitrust claim" definition should be interpreted to mean it applies only to additional coverage provided by the endorsement, and that the sublimit applies on a cause-of-action by cause-of-action basis.[182]  The carriers assert that the court should apply the antitrust-claim definition as written and that "Claim" means a single lawsuit or complaint,[183] so any allegations in the complaint attributable or in any way involving antitrust violations cap coverage for the whole lawsuit at $5 million.[184]

---

[179] ECF No. 262-10 at 34.

[180] *Id.*

[181] *Id.* at 35.

[182] ECF No. 280 at 33–35; *see generally* ECF No. 294.

[183] ECF No. 275 at 24–27.

[184] *Id.*

### 1.    *The antitrust-coverage endorsement amends the coverage provided by the original policy.*

EB Holdings II construes the antitrust-coverage endorsement as if it is an excess-coverage provision, arguing that it merely provides additional coverage for antitrust causes of action otherwise excluded by the original policy's antitrust exclusion,[185] so it has no impact on the coverage provided by other provisions of the policy.[186]  EB holdings II contends, therefore, that the endorsement doesn't apply here "because [p]laintiffs aren't seeking—and have never sought—the additional coverage that this Endorsement provides for an 'Antitrust Claim.'"[187]

But the antitrust-coverage endorsement is not an excess-coverage provision, and EB Holdings II's interpretation does not square with Texas's view of endorsements.  An endorsement is not a separate policy; a validly made endorsement merges with the original policy to form one contract.[188]  A policy and its endorsements must be read together "unless they are so much in conflict they cannot be reconciled."[189]  Even then, "[i]n the case of an irreconcilable conflict, endorsements to a policy generally supersede and control over conflicting

---

[185] ECF No. 280 at 33–35.  The policy's antitrust exclusion states that the insurer is not liable for any claims brought against the company "for any actual or alleged violation of any law, whether statutory, regulatory or common law, respecting any of the following activities: anti-trust, business competition, unfair trade practices or tortious interference in another's business or contractual relationships."  ECF No. 262-10 at 15.

[186] ECF No. 280 at 33.

[187] ECF No. 294 at 8.

[188] *El-Habr v. Mountain States Mut. Cas. Co.*, 626 S.W.2d 171, 172 (Tex. App. 1981); *Eddie Yaklin Ford Lincoln Mercury Nissan Inc. v. Am. Rd. Ins. Co.*, 2017 WL 3387186, at *5 (S.D. Tex. Aug. 4, 2017).

[189] *StarNet Ins. Co. v. RiceTec, Inc.*, 586 S.W.3d 434, 445 (Tex. App. 2019).

1  printed terms contained within the main policy."[190]  And "endorsements may narrow the

2  effective coverage."[191]

3      EB Holdings II cites *Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*[192] for the

4  proposition that "a limitation on coverage contained in one provision of the policy . . . does not

5  limit the coverage that is available under other provisions of the policy."[193]  In *Evanston*, a

6  contractor with a refinery took out a general liability insurance policy and an excess policy that

7  named the refinery as an additional insured.[194]  The excess policy contained two coverage-

8  granting sections: a provision that limited coverage to what the underlying policy covered and an

9  another provision that contained no such limitation.[195]  One of the contractor's employees died in

10  an accident at the refinery, and his family sued the refinery and the contractor.[196]  The refinery

11  claimed it was covered under the excess policy's two coverage-granting provisions.[197]  The

12  insurer asserted that there was no coverage because the narrower provision excluded claims

13  resulting solely from the refinery's negligence, and that restriction extended to the broader

14  provision if the claim fell under both provisions.[198]  The Texas Supreme Court held that the

15  broader term provided coverage even if the narrower excluded coverage.[199]  It reasoned that

16

17  ---

[190] *Id.*

18  [191] *Farmers Tex. Cnty. Mut. Ins. Co. v. Zuniga*, 548 S.W.3d 646, 653 n.3 (Tex. App. 2017).

19  [192] *Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660, 668 (Tex. 2008).
[193] ECF No. 280 at 33–34.

20  [194] *Evanston*, 256 S.W.3d at 662.

21  [195] *See id.* at 663–68.

[196] *Id.* at 662–63.

22  [197] *See id.* at 663–68.

[198] *Id.* at 668.

23  [199] *Id.*

"[n]othing in [the relevant section] suggests that the limitations of one section granting coverage should be read into another separate section granting coverage."[200]

Evanston is materially distinguishable from the instant case because the endorsement here contains language that limits the coverage granted by the original policy.  That endorsement expressly states that it amends the limit-of-liability section in the main policy to add the language that "[t]he aggregate limit of the Insurer's liability for *all Loss under [the main policy's] D&O Coverage Section* arising from all Antitrust Claims is [$5 million]."[201]  Similarly, the endorsement states that its "Antitrust Sublimit of Liability shall be part of and not in addition to the Policy Aggregate Limit of Liability."[202]  So the antitrust sublimit was expressly incorporated into the main policy, and it is not a separate grant of coverage to analyze independently.

### 2.    *"Antitrust claim" is not ambiguous.*

EB Holdings II nonetheless redoubles its efforts to refashion the endorsement into an excess-coverage provision, this time based on language in the endorsement stating that the definition section "of the D&O Coverage Section" is amended "[s]olely with respect to the coverage provided by this endorsement for Antitrust Claims."[203]  EB Holdings II seizes on this language to argue that it makes the definition of "antitrust claim" and the sublimit's scope ambiguous and adopting its preferred construction would have the practical result of removing the GoldenTree complaint from the sublimit's otherwise expansive definition of "antitrust claim."  But this argument fails on two fronts: EB Holdings II has not shown that there are two

---

[200] *Id.*

[201] ECF No. 262-10 at 34, at ¶ 2 (emphasis added).

[202] *Id.*

[203] *Id.* at 35.

1    reasonable constructions of this language and the sublimit's scope, and it has not shown its

2    particular construction is reasonable.

3        A contract is ambiguous in Texas if it is subject to two or more reasonable

4    interpretations.[204] "Whether a contract is ambiguous is a question of law for the court to decide

5    by looking at the policy as a whole in light of the circumstances present when the contract was

6    entered."[205] "In construing a contract, [the court must] consider how a reasonable person would

7    have used and understood the language, taking into account the circumstances under which the

8    contract was executed and the purposes the parties intended to accomplish."[206] The court may

9    also rely on the "structure of the policy."[207] "Although interpreting an insurance policy to give a

10   reasonable meaning to all provisions is preferable to interpreting the policy in a way that creates

11   surplusage or leaves a portion of the policy useless or inexplicable, surplusage alone does not

12   make an insurance policy ambiguous."[208]

13       EB Holdings II contends that the endorsement's definition of the phrase "antitrust claim"

14   is rendered ambiguous because of the wording in the definition's preamble, which states:

15           Solely with respect to the coverage provided by this endorsement
             for **Antitrust Claims**, Clause 2. "DEFINITIONS" of the D&O
16           Coverage Section is amended by adding the following Definition
             to the end thereof:

17

18

---

19   [204] *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998); *see also Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017) ("An ambiguity does not arise merely because a party offers an alternative conflicting interpretation, but only when the contract is actually susceptible to two or more reasonable interpretations. The fact that the parties may disagree about the policy's meaning does not create an ambiguity.").

21   [205] *In re Deepwater Horizon*, 470 S.W.3d 452, 464 (Tex. 2015).

22   [206] *Verhoev v. Progressive Cnty. Mut. Ins. Co.*, 300 S.W.3d 803, 816 (Tex. App. 2009).

23   [207] *Balandran*, 972 S.W.2d at 740.

     [208] *Grain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455, 458 (Tex. 1997).

> "**Antitrust Claim**" means any **Claim** alleging, arising out of,
> based upon or attributable to, or in any way involving, either
> directly or indirectly, antitrust violations . . . .[209]

According to EB Holdings II, the phrase "[s]olely with respect to the coverage provided by this endorsement" means that the antitrust-claim definition applies only to the additional coverage the endorsement supplies over the original policy.[210]  In other words, that expansive definition only applies if the original policy didn't cover the loss—which here, would likely mean a claim originally excluded under the policy's more narrowly worded antitrust exclusion.[211]  As EB Holdings II argues, this endorsement was added to the policy to expand the scope of coverage to claims that would otherwise be excluded by the policy's antitrust exclusion, otherwise the endorsement covers more than the gap it fills.[212]  And even if that interpretation seems like a stretch, EB Holdings II contends that Texas's policy-interpretation rules require the court to adopt it.[213]

But even Texas's insured-friendly rules don't support EB Holding II's interpretation. The rule requires the court to pick the insured's construction of a policy term only if it is reasonable and the policy is ambiguous.[214]  And EB Holdings II's interpretation is not reasonable because it creates a second, bigger surplusage problem: it would essentially write the antitrust-claim definition out of the policy entirely and replace it with a new definition that departs significantly from the definition's plain language.  Courts should reject this type of

---

[209] ECF No. 262-10 at 35.

[210] ECF No. 294 at 8.

[211] *See id.* at 15–17.

[212] *Id.*

[213] *Id.* at 17.

[214] *Bitco* 31 F.4th at 329.

"unreasonable construction" or "tortured reading" of policy language because it would "alter the plain language of the clause, frustrating the reasonable expectations of the parties when contracting for insurance."[215]  On the other hand, the "solely" language can be read harmoniously with the antitrust claim's definition because the "coverage provided by this endorsement" uses the definition of "antitrust claim" to define its scope and is thus synonymous with the definition of "antitrust claim."[216]  While the "solely" language seems unnecessary in this interpretation, "useless or inexplicable" language does not make a policy ambiguous.[217]

So I reject EB Holding II's characterization of the endorsement and the language in the antitrust-claim definition's preamble.  It has failed to show there are two or more reasonable constructions of this section, so the "solely" language does not create an ambiguity.  And even if there were, its construction of the endorsement as essentially an excess-coverage provision is unreasonable and runs afoul of Texas's tenets of contract and policy interpretation.  I conclude that the definition of "antitrust claim" is not ambiguous, and it applies as written.  Any claim

---

[215] *Bituminous Cas. Corp. v. Maxey*, 110 S.W.3d 203, 214 (Tex. App. 2003).

[216] ECF No. 262-10 at 35.

[217] *Grain Dealers*, 943 S.W.2d at 458.  Even if the court were to interpret the language as ambiguous, the extrinsic evidence that EB Holdings II provides—two email chains—doesn't show that EB Holdings II's interpretation was reasonable and that the endorsement was intended to apply only to otherwise excluded causes of action.  ECF No. 294 at 15.  In the first email chain, EB Holdings II's broker stated that EB Holdings II "would consider an [additional premium]" for the endorsement.  *Id.* (citing ECF No. 280-21 at 4).  And the second email shows a brief internal discussion between the underwriters that EB Holdings II characterizes as "indicat[ing] that Illinois National understood that this Endorsement was adding additional risk, rather than limiting the insurer's liability."  *Id.* (citing ECF No. 280-20).  But even if EB Holdings II's characterization of the emails is accurate, increased risk does not necessarily mean that an endorsement applies only to previously excluded causes of action because an endorsement could increase risk for an antitrust cause of action while still limiting risk in other areas.

"alleging, arising out of, based upon or attributable to, or in any way involving, either directly or indirectly, antitrust violations" is subject to the endorsement.[218]

### 3.    *"Claim" refers to the entire lawsuit.*

EB Holdings II next asserts that even if the antitrust sublimit applies, the court must parse the GoldenTree complaint and apply the sublimit only to the causes of action that meet the definition of "antitrust claim."[219]  Thus, the $5 million cap would apply to some claims, leaving the larger pot of coverage for the remaining claims.  The main policy defines "Claim," which the antitrust-claim definition incorporates, as "a written demand for monetary or non-monetary relief" and as "a civil . . . proceeding for monetary or non-monetary relief" commenced "by service of a complaint or similar pleading."[220]  EB Holdings II argues that a complaint is a collection of written demands, so the GoldenTree complaint includes more than one written demand for relief, and each of the complaint's nine causes of action is a separate and distinct written demand for relief.[221]

The insurers see it differently.  They reason that the civil-proceeding-commenced-by-complaint definition refers to the lawsuit as a whole because a lawsuit is a single civil proceeding and it is commenced by a complaint just once.[222]  So the sublimit applies here because the GoldenTree case was a "civil proceeding" that was at least indirectly attributable to "antitrust violations."[223]  The insurers reject EB Holdings II's notion that a complaint constitutes multiple

---

[218] ECF No. 262-10 at 33.

[219] ECF No. 294 at 28.

[220] ECF No. 262-10 at 9.

[221] ECF No. 294 at 29.

[222] ECF No. 279 at 16–21.

[223] *Id.* at 21–29.

written demands under the policy language because "[c]onstruing each cause of action to be a 'written demand for relief' and so a separate 'Claim' would render the prong of the definition of 'Claim' referring to a 'civil proceeding' completely superfluous because every civil proceeding would necessarily constitute a 'written demand for relief.'"[224]

### a.    The policy language supports a reading of "Claim" as synonymous with "lawsuit."

Courts interpreting the definition of "Claim" in such policies have reached divergent results. Some courts have disregarded the policy's definition of the term, instead treating "Claim" as synonymous with "cause of action."[225] For example, EB Holdings II cites to *Health Net, Inc. v. RLI Insurance Co.*,[226] a California Court of Appeal decision involving a policy that excluded "Claims" arising out of dishonest acts and defined "Claim" as a "judicial . . . proceeding."[227] Based on those definitions, the trial court concluded that the lawsuit, which related to a medical insurer's intentional use of outdated and incorrect databases, constituted a dishonest act and that "Claim" referred to the entire action.[228] So the trial court held that the exclusion barred coverage for the whole lawsuit even though the complaint contained causes of

---

[224] *Id.* at 19 (cleaned up).

[225] *HM Int'l, L.L.C. v. Twin City Fire Ins. Co.*, 13 F.4th 356, 360 (5th Cir. 2021); *see also John C. Lincoln Health Network v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 2012 WL 12904241, at *6 (D. Ariz. Sept. 4, 2012) (analyzing each of cause of action to determine if it fell within the definition of antitrust claim).

[226] ECF No. 294 (citing *Health Net, Inc. v. RLI Ins. Co.*, 206 Cal. App. 4th 232 (2012)). EB Holdings II also cites several other nonbinding cases employing similar logic. *See* ECF No. 294 (collecting cases).

[227] *Health Net*, 206 Cal. App. 4th at 260–61.

[228] *Id.* at 249.

action unrelated to dishonest acts.[229]  But the California Court of Appeal reversed.[230]  It construed "Claim" as identifying "only the time when policy duties arise,"[231] concluding that "it does not speak to its scope."[232]  And it reasoned that "interpreting 'Claim' to mean 'entire action' would . . . result in numerous unreasonable interpretations of other terms in the policy" and significantly limit coverage.[233]

But I do not find the *Health Net* line of cases persuasive here because it is incongruous with the language in the Illinois National policy.  "[W]hen terms are defined in an insurance policy, those definitions control,"[234] and a "term's common-law meaning will not override the definition given to a contractual term by the contracting parties."[235]  Further supporting that the policy's definition of claim controls here, the Illinois National policy also bolds and capitalizes the term "Claim" in the antitrust-claim definition, [236] which are conventional signals in a policy indicating that a policy's definition applies.[237]  So the court should interpret "Claim" as it is defined in the policy.

---

[229] *Id.*

[230] *Id.* at 264.

[231] *Id.* at 260 (emphasis omitted).

[232] *Id.* at 261.

[233] *Id.*

[234] *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 823 (Tex. 1997).

[235] *TEC Olmos, LLC*, 555 S.W.3d at 181.  The Fifth Circuit applying Texas law in a different context recently reversed a district court for ignoring the policy's definition of "Claim" and instead treating claim as synonymous with cause of action.  *HM Int'l*, 13 F.4th at 360 (characterizing "the district court [not accounting] for the policy's definition of the term claim, [and] instead treating it as synonymous with 'cause of action'" as an "error").

[236] ECF No. 262-10 at 35.

[237] *See Certain Underwriters* at *Lloyd's, London Subscribing to Pol'y No. 509/QF037603 v. LM Ericsson Telefon, AB*, 272 S.W.3d 691, 696 (Tex. App. 2008) (citing Bryan A. Garner, A Dictionary of Modern Legal Usage 256 (2d ed. 1995)) ("We note that boldface and italicized type are conventional signals for the use of contractually defined terms."); *Musket Corp. v.*

Courts that have interpreted the same or similar "Claim" definitions in the instant policy and endorsement have found them to mean a lawsuit as a whole.[238]  For example, the First Circuit in *Federal Insurance Co. v. Raytheon Co.* interpreted "a civil proceeding commenced by the service of a complaint or similar pleading . . . against any Insured for a Wrongful Act" to mean the complaint as a whole.[239]  The Seventh Circuit in *Market Street Bancshares, Inc. v. Federal Insurance. Co.* similarly interpreted "a civil proceeding commenced by the service of a complaint" as spanning the entire civil action because "a complaint commences an action as a whole, not just part of one."[240]  And in a different context, the Fifth Circuit in *National Union Fire Insurance. Co. of Pittsburgh, PA v. Willis* rejected the argument that filing an amended complaint creates a new "Claim" because that "would result in one lawsuit qualifying as two different civil proceedings."[241]  So as the Third Circuit put it in an unpublished decision in *Westport Insurance Corp. v. Mylonas*, "including more causes of action in a complaint does not create more claims under the Policy, nor does pleading the harm done as a greater number of

---

*Suncor Energy (U.S.A.) Mktg., Inc.*, 759 F. App'x 280, 296 (5th Cir. 2019) (unpublished) ("Throughout the Agreement, important terms—such as 'Term', 'Committed Volumes,' and 'Windsor Terminal'—are bold and capitalized the first time the term appears, signaling that the terms are defined terms of the Agreement when they first appear.").

[238] "In ordinary usage the word 'claim' can refer to a single theory of liability, or it can refer to an entire lawsuit including multiple theories."  *TIG Specialty Ins. Co. v. Pinkmonkey.com Inc.*, 375 F.3d 365, 376 (5th Cir. 2004) (Pickering, J., concurring).  Many of the cases EB Holdings II relies on—such as *Fed. Ins. Co. v. Northfield Ins. Co.*, 837 F.3d 548, 550 (5th Cir. 2016)—apply the ordinary usage of "Claim" to reach their respective conclusions.  But that is not how this policy defines "Claim."

[239] *Fed. Ins. Co. v. Raytheon Co.*, 426 F.3d 491, 497 (1st Cir. 2005).

[240] *Mkt. St. Bancshares, Inc. v. Fed. Ins. Co.*, 962 F.3d 947, 953–54 (7th Cir. 2020).

[241] *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Willis*, 296 F.3d 336, 342 (5th Cir. 2002).  EB Holdings II points out that many of these cases are defining "Claim" to determine when a claim is "first made" rather than the scope of an exclusion.  That may be true, but this policy uses that definition of claim in its exclusions and the antitrust sublimit.  *See* ECF No. 262-10 at 35.

discrete wrongful acts.  Our analysis does not look to the terms of the underlying Complaint to determine how many claims were filed.  We look only to the number of demands for loss made upon the insured—i.e. the number of suits served—as required by the Policy."[242]

The circuits' interpretation in these cases is logical: a lawsuit is a singular civil proceeding, not a collection of them.  The Illinois National policy also uses the term "cause of action" in other places in the policy, but not in the definition of claim,[243] which suggests that "Claim" is not synonymous with "cause of action" here because it would make the use of "cause of action" elsewhere "meaningless or redundant."[244]  Given the weight of authority and the support for the insurers' interpretation, I conclude that the term "Claim" refers to the lawsuit as a whole and not based on individual causes of action.[245]

---

[242] *Westport Ins. Corp. v. Mylonas*, 704 F. App'x 127, 131 (3d Cir. 2017).

[243] *See, e.g.*, ECF No. 262-10 at 11 ("Claims can allege Related Wrongful Acts regardless of whether such Claims involve the same or different claimants, Insureds or legal causes of action.").

[244] *Prime Nat. Res., Inc. v. Certain Underwriters* at *Lloyd's, London*, 2015 WL 1457534, at *9 (Tex. App. Mar. 26, 2015) (unpublished) (rejecting notion that two terms both appearing in a policy were synonymous because "an interpretation would render one or the other term meaningless or redundant").

[245] EB Holdings II also cites to *Level 3 Commc'ns, Inc. v. Fed. Ins. Co.*, 168 F.3d 956, 960 (7th Cir. 1999), in which Judge Posner reversed a district court ruling that interpreted the "civil proceeding" claim definition as applying an exclusion to the entire case if there was a single insured plaintiff.  *Id.*  But he based that ruling on the contract's allocation clause rather than the definition of "Claim."  *Id.*  Posner noted that "[t]he contract . . . defines 'Claim' as 'a civil proceeding commenced by the service of a complaint or similar pleading,' and the district court thought this meant that if any of the plaintiffs were Insureds, there was no coverage.  This is not an outlandish interpretation."  *Id.*  The policy in this case contains no similar allocation clause.

EB Holdings II also cites case law regarding mixed claims, or complaint alleging both covered and non-covered claims.  "It is settled law in Texas that '[i]f a complaint alleges at least one cause of action that is 'potentially' within the policy's coverage, the insurer must defend the entire lawsuit.'"  *Bitco*, 31 F.4th at 329.  But that rule seems to relate to an insured's initial burden of establishing coverage.  The scope of an exclusion, on the other hand, should be determined by the exclusion's plain language.  *See Bituminous Cas. Corp.*, 110 S.W.3d at 214.

### b.    To construe each cause of action as a written demand would ignore the policy language and structure.

The notion that each cause of action in a complaint constitutes a separate written demand under the policy was rejected by the U.S. District Court for the District of Utah in *Stoneburner v. RSUI Indemnity Co.*[246]  Twenty plaintiffs sued the Union Square Owner's Association, and some of those plaintiffs happened to also be insureds under the association's D&O policy.[247]  The insurer denied coverage for the suit because the policy excluded any claim brought by an insured.[248]  The association then sued the insurer, arguing that the insurer should have denied coverage only for the causes of action brought by an insured, and not those brought by other plaintiffs.[249]  But the court rejected the association's interpretation.[250]  It reasoned that the policy defined "Claim" as a "civil proceeding" commenced by a "complaint," which would be the entire underlying lawsuit.[251]  And interpreting "written demand for monetary or non-monetary relief" as synonymous with cause of action would create a surplusage issue because each civil

---

[246] *Stoneburner v. RSUI Indem. Co.*, 598 F. Supp. 3d 1292, 1297–98 (D. Utah 2022).  The insurers also cite to *Las Vegas Sands, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, in which Judge Mahan concluded that "Claim" referred to the entire action in a similarly worded insurance policy governed by Nevada law.  2024 WL 4279382, at *3 (D. Nev. Sept. 23, 2024), *vacated and remanded sub nom. Las Vegas Sands, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 2025 WL 3754348 (9th Cir. Dec. 29, 2025) (unpublished).  But Judge Mahan's *Sands* ruling was reversed by the Ninth Circuit in an unpublished disposition during the pendency of these motions.  *See Las Vegas Sands*, 2025 WL 3754348, at *2–3.  Judge Mahan's decision cited no authority for his conclusion, and the panel found none under Nevada or California law, so it remanded for "the district court to determine" the issue more thoroughly.  *Id.*  Because Texas law governs this policy and the Ninth Circuit's decision in *Las Vegas Sands* is unpublished, I conclude that *Las Vegas Sands* does not alter my ultimate conclusion.

[247] *Id.* at 1293–94.

[248] *Id.*

[249] *Id.* at 1294, 1297.

[250] *Id.* at 1297.

[251] *Id.*

proceeding would contain a "written demand," making the "civil proceeding" definition

unnecessary.[252]  Rather, the structure of the policy suggests that the "written demand" definition

refers to a demand letter, "the civil proceeding" definition refers to legal proceedings, and the

remaining definition relates to investigations.[253]  So "written demand" was not synonymous with

cause of action, and the claim definition didn't require parsing the complaint for coverage.[254]

EB Holdings II counters with the U.S. District Court for the District of Arizona's order in

*Tapestry on Central Condominium Ass'n v. Liberty Insurance Underwriters Inc.*[255]  In the

*Tapestry* case, a contractor sued a condominium association alleging breach of three different

contracts, including one relating to construction defects.[256]  The insurer denied coverage,

theorizing that the policy's construction-defect exclusion applied to one of the causes of action,

and all the causes of action in the complaint together formed a single claim under the policy's

definitions.[257]  Tapestry asserted that each cause of action was a separate claim because each

cause of action was a separate "written demand."[258]  The policy defined "Claim" as:

> (a) a written demand for monetary or non-monetary relief against [Tapestry];

---

[252] *Id.*

[253] *See id.*

[254] *Id.*; *cf. Uni-Pixel, Inc. v. XL Specialty Ins. Co.*, 2020 WL 1528098, at *5 (Tex. App. Mar. 31, 2020) ("[T]he separate proceedings underlying this action all constitute individual 'Claims': the Class Action, the Derivative Suit, and the SEC Enforcement Action are 'civil proceeding[s] in a court of law', and the SEC Formal Investigation and Wells Notices are 'formal investigation[s] of an Insured Person or the Company.'").

[255] *Tapestry on Cent. Condo. Ass'n v. Liberty Ins. Underwriters Inc.*, 461 F. Supp. 3d 926 (D. Ariz. 2020).

[256] *Id.* at 930.

[257] *Id.*

[258] *Id.*

(b) the commencement of a civil or criminal judicial proceeding or arbitration against [Tapestry];

(c) the commencement of a formal criminal, administrative or regulatory proceeding or investigation against [Tapestry]; or including any appeal therefrom.[259]

Based on that definition, the court concluded that "written demand" and thus "Claim" referred to the individual causes of action in the complaint.[260]  It largely based that ruling on two grounds. First, citing to *Health Net*, the court reasoned that the single-claim interpretation belied the purpose of claim-based policies,[261] because the claim definition was intended to mark when a claim accrued, not necessarily what the scope of an exclusion was,[262] and the "commencement" language suggested that "Claim" relates to time.[263]  And second, if the definition did apply, the court needed to parse the complaint by cause of action because each cause of action was a "written demand."[264]  It reasoned that the second and third definition already overlapped, so there was no surplusage issue like in *Stoneburner*.[265]

I find that neither ground in *Tapestry* applies here.  As explained *supra*, the reasoning of *Health Net* impermissibly ignores this policy's definition of "Claim."  The Illinois National policy also lacks the temporal focus that the definition in *Tapestry* had—the Tapestry policy

---

[259] *Id.* at 931.

[260] *Id.* at 931–34.

[261] *Id.* at 933 (citing *Health Net*, 206 Cal. App. 4th at 261).

[262] *Id.* (citing *Health Net*, 206 Cal. App. 4th at 261).

[263] *Id.*

[264] *Id.*

[265] *Id.*  The *Tapestry* court did not cite *Stoneburner*, which was decided two years later, but rather the First Circuit's decision in *UBS Fin. Servs., Inc. of P.R. v. XL Specialty Ins. Co.*, 929 F.3d 11, 23 (1st Cir. 2019), which used similar logic.

defined "Claim" as the "*commencement* of a civil or criminal judicial proceeding" rather than a *civil proceeding* commenced by complaint like in the Illinois National policy. Finally, the Illinois National policy's definitions of "Claim" contain no apparent overlap because the definitions can be read to give each of the individual definitions meaning like in *Stoneburner*. So I conclude that, under this policy's definition of "Claim," the sublimit applies to any lawsuit as a whole that relates to antitrust violations.

### 4.    The GoldenTree complaint arises out of an antitrust violation.

Having resolved the matter of the sublimit's interpretation, I turn to its application and evaluate whether the GoldenTree complaint is a "Claim" "alleging, arising out of, based upon or attributable to, or in any way involving, either directly or indirectly, antitrust violations."[266] The threshold to trigger this sublimit is low based on that language. Texas interprets "arising out of" to require "but for causation, though not necessarily direct or proximate causation."[267] Continental argues that the relationship can be even more tenuous; it cites nonbinding authority stating that the "or in any way involving" language is even broader, it "is a mop-up clause intended to exclude anything not already excluded by the other clauses."[268]

---

[266] *See* ECF No, 262-10 at 34–35.

[267] See *Utica Nat. Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 203 (Tex. 2004).

[268] *Clark Sch. for Creative Learning, Inc. v. Phila. Indem. Ins. Co.*, 734 F.3d 51, 56 (1st Cir. 2013); *Nat'l Bank of Cal. v. Progressive Cas. Ins. Co.*, 938 F. Supp. 2d 919, 931 (C.D. Cal. 2013) ("The most explicit indication of [the] intent" to "maximally expand" the scope of an exclusion is the inclusion of the phrase "in any way involving."). Whereas the South District of Texas interpreted "in any way involving" as to still require some causal relationship between the contract and the claim. *Admiral Ins. Co. v. Briggs*, 264 F. Supp. 2d 460, 463 (N.D. Tex. 2003) (holding that "in any way involving" must be read in a manner consistent with the terms 'based upon, arising out of, directly or indirectly resulting from or in consequence of' a contract—all terms indicating a causal relationship between the contract and the claim").

The GoldenTree complaint does not allege an explicit antitrust cause of action, but many of the GoldenTree group's general allegations relate to antitrust violations. The complaint alleges that Meyers directed Eco-Bat to engage in anticompetitive behavior in Europe and Italy,[269] Eco-Bat abused its considerable market power to artificially increase Eco-Bat's earnings,[270] and "Meyers knew that the supracompetitive profits were not sustainable . . . [and] therefore hatched a scheme to raise more money from investors using the inflated earnings of Eco-Bat and its subsidiaries."[271] In its motion for summary judgment, Continental links each cause of action to Eco-Bat's antitrust violations.[272] In its initial briefing, EB Holdings II seems to concede that the sublimit would apply to two causes of action—fraud in the inducement and racketeering—but walks that concession back in later briefing.[273] So EB Holdings II now argues that Texas requires the court to look "to the factual allegations showing the origin of the damages claimed, not the legal theories of conclusions alleged,"[274] and none of the GoldenTree group's causes of action are antitrust claims because the cartels manipulated the prices of lead batteries or scrap metal feedstock.[275] It adds that the origin of the investors' damages was purchasing inflated securities, not those products.[276]

---

[269] ECF No. 262-4 at ¶ 65–66.

[270] *Id.* at ¶ 67.

[271] *Id.* at ¶ 68.

[272] ECF No. 279 at 24–29.

[273] ECF No. 280 at 35; ECF No. 294 at 11–12.

[274] ECF No. 294 at 12 (citing *Ewing*, 420 S.W.3d at 33).

[275] *Id.* at 12. EB Holdings II also argues that the court should interpret the antitrust-coverage endorsement as applying only if the complaint alleges that an insured committed the antitrust violations. *Id.* But that would not lead to a different result because Meyers and Eco-Bat were insureds under the policy.

[276] *Id.*

46

At the very least, the GoldenTree group's fraud-in-the-inducement and racketeering causes of action arise out of alleged Eco-Bat antitrust violations, and EB Holdings II's argument to the contrary is unavailing.  In the fraud-in-the-inducement cause of action, the GoldenTree plaintiffs expressly allege that they purchased the Series 97 Notes based on false representations about Eco-Bat's profitability,[277] and the racketeering cause of action alleged a racketeering scheme based upon those same fraudulent misrepresentations.[278]  Eco-Bat could not have reported such a high profitability without the alleged price-fixing scheme.[279]  So part of the origin of the damages was Eco-Bat's alleged antitrust violations.  And because the price-fixing scheme was necessary for these causes of action, there is a "but for" relationship sufficient to show that these causes of action arose out of antitrust violations.[280]  The antitrust sublimit therefore applies to the GoldenTree lawsuit, and EB Holdings II's coverage for that suit is capped at $5 million under the primary policy.

---

[277] ECF No. 262-4 at ¶ 8.

[278] *Id.* at ¶ 186.

[279] *Id.* at ¶ 157.

[280] Although the relationships between the antitrust violations and the remaining causes of action are less direct, each cause of action in the GoldenTree complaint can similarly be linked to the antitrust violations.

Texas's independent-causation doctrine does not change this result, despite EB Holding II's suggestions otherwise.  "In cases involving separate and independent causation, the covered event and the excluded event each independently cause the plaintiff's injury, and the insurer must provide coverage despite the exclusion."  *Utica*, 141 S.W.3d at 204.  But in "cases involving concurrent causation, the excluded and covered events combine to cause the plaintiff's injuries.  Because the two causes cannot be separated, the exclusion is triggered."  *Id.*  Eco-Bat's antitrust violations were concurrent, not independent, causes of the GoldenTree lawsuit because the underlying litigation would not have arisen without the violations.

1

2

> **5.**      ***The excess insurers are entitled to summary judgment because the antitrust sublimit means that their policies will not get triggered.***

3    The application of the $5 million antitrust sublimit means that the excess policies will not

4 come into play.  An insurer is not liable for breach of contract or extracontractual tort claims if

5 its policy does not cover the claim.[281]  The Federal and Continental policies are only triggered by

6 losses that far exceed $5 million.[282]  Both policies also explicitly disclaim coverage if a sublimit

7 in the primary policy applies.[283]  I thus grant Continental's motion for summary judgment, along

8 with Federal's motion in part, and enter summary judgment in favor of Continental and Federal

9 because the antitrust sublimit prevents their excess policies from even triggering.[284]  For the

10 same reasons, Illinois National's excess policy does not provide coverage for this suit, and

11 Illinois National is entitled to summary judgment as to claims based on its excess policy.

12

**F.    EB Holdings II is entitled to summary judgment on some of Illinois National's**
13    **affirmative defenses.**

14    Finally, EB Holdings II moves for summary judgment on several of Illinois National's

15 affirmative defenses.  Because a defendant bears the burden of proof as to its affirmative

16 defenses, Illinois National must offer sufficient evidence to raise a triable issue of fact as to each

17

18

---

19 [281] *Progressive Cnty. Mut. Ins. Co. v. Boyd*, 177 S.W.3d 919, 922 (Tex. 2005).

[282] *See* ECF No. 262-13 at 10.

20 [283] ECF No. 261-11 at 5 ("If any loss under any Underlying Insurance is subject to a sub-limit, then this Policy provides no coverage excess of such Underlying Insurance sub-limit, but the
21 Underlying Insurance shall be deemed depleted by payment of any such sub-limit."); ECF No. 262-13 at 13 ("If any Underlying Limit is subject to a Sublimit: coverage hereunder shall not
22 apply to any claim which is subject to such Sublimit . . . .").

23 [284] Federal's motion for summary judgment, ECF No. 263, is thus denied in part as moot because the antitrust sublimit caps coverage well below the amount of billings that Federal asserts is excessive.

element of any defense that it wishes to pursue to survive summary judgment.[285]  This must take

the form of significant and probative evidence that supports its affirmative defense.[286]  The court

will not "scour the record in search of a genuine issue of triable fact."[287]

Illinois National's sixteenth affirmative defense is that the claim accrued prior to the

policy period.[288]  Illinois National relies on two documents: an offer from EB Holdings II to the

GoldenTree group in 2015 to restructure the loan[289] and two paragraphs in EB Holdings II's

complaint against the GoldenTree group.[290]  As explained *supra*, neither of these documents

shows that EB Holdings II received a written demand or should have reasonably understood that

a written demand was imminent.[291]  Given the lack of support for Illinois National's theory that

EB Holdings II's claim accrued before the policy period, I grant EB Holdings II's motion for

summary judgment on this affirmative defense.

EB Holdings II also moves for summary judgment on Illinois National's material-

misrepresentation defense, which is its seventeenth affirmative defense.  As the Ninth Circuit

noted in *EB Holdings II*, Texas law requires "Illinois National . . . to prove two additional

elements to succeed on the defense: (1) that there was intent to deceive on the part of the

Insureds; and (2) that Illinois National gave notice to the Insureds of its refusal to be bound by

---

[285] *Clark v. Cap. Credit & Collection Servs.*, 460 F.3d 1162, 1177 (9th Cir. 2006) (noting
defendants bore the burden of proof as to an affirmative defense at summary judgment).

[286] *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).

[287] *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

[288] ECF No. 88 at 24.

[289] ECF No. 280-23.

[290] ECF No. 262-5 at ¶ 59.

[291] *Supra* at 19.

1   the policy, within 90 days of discovering the falsity of the applications."[292]  EB Holdings II cites

2   Illinois National's brief in support of its prior motion for summary judgment before Judge

3   Mahan to argue that "Illinois National admit[ed] that it was aware of the alleged omission by

4   November 2016"[293] and that Illinois National never gave it the statutory notice.[294]  For its part,

5   Illinois National contends that this supposed "admission" was from an inadmissible attorney

6   statement,[295] but it does not point to any evidence showing it gave EB Holdings II the statutory

7   notice at any point.  Because "[t]his statutory notice is an essential element of a defense based on

8   misrepresentation,"[296] I grant summary judgment for EB Holdings II on this affirmative defense.

9          EB Holdings II's final challenge—that Illinois National's remaining affirmative defenses

10  were waived—is too underdeveloped for EB Holdings II to meet its own burden on this motion.

11  EB Holdings II asserts that "Illinois National has abandoned its third, sixth, eleventh, thirteenth,

12  fourteenth, and nineteenth affirmative defenses."[297]  A "moving party without the burden at trial

13  need only "show that the nonmoving party does not have enough evidence of an essential

14  element to carry its ultimate burden of persuasion at trial."[298]  But "[i]f a moving party fails to

15  carry its initial burden of" this showing, "the nonmoving party has no obligation to produce

16  anything, even if the nonmoving party would have the ultimate burden of persuasion at trial."[299]

17

18  [292] *EB Holdings II*, 108 F.4th at 1217 (citing Tex. Ins. Code. § 705.005(b)).

19  [293] ECF No. 280 at 29 (citing ECF No. 153).

20  [294] *Id.*

    [295] ECF No. 288 at 31–32.

21  [296] *EB Holdings II*, 108 F.4th at 1223 (citing *Koral Indus., Inc. v. Sec.-Conn. Life Ins. Co.*, 788
22  S.W.2d 136, 148 (Tex. App. 1990)).

    [297] ECF No. 280.

23  [298] *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

    [299] *Id.* at 1102–03.

EB Holdings II's single-sentence argument is insufficient to meet its burden, so I deny its request for summary judgment on Illinois National's remaining affirmative defenses.

### Conclusion

IT IS THEREFORE ORDERED that EB Holdings II and Illinois National's motions for summary judgment **[ECF Nos. 274, 280]** are **GRANTED** in part and **DENIED** in part.  EB Holdings II's motion for leave to file a surreply **[ECF No. 307]** is **GRANTED**.  Continental's motion for summary judgment **[ECF No. 279]** is **GRANTED.**  Federal's motion for summary judgment **[ECF No. 263]** is **GRANTED** in part and **DENIED** in part as moot:

- The Illinois National primary policy covers the GoldenTree case.

- The specific-entity exclusion and public-offering exclusion do not preclude coverage.

- The antitrust sublimit applies and caps coverage under the primary policy at $5 million.

- Continental and Federal are entitled to summary judgment in their favor because the applicability of the antitrust sublimit prevents their policies from triggering and an insurer is not liable for breach of contract or extracontractual tort claims if its policy does not cover the claim. **The Clerk of Court is directed to TERMINATE as parties Continental Casualty Company and Federal Insurance Company.**

- Illinois National is entitled to summary judgment on all claims arising from its excess policy because the antitrust sublimit prevents its policies from triggering.

- Summary judgment is denied as to EB Holdings II's tort claims against Illinois National.

- EB Holdings II is entitled to summary judgment on Illinois National's material-misrepresentation affirmative defense and the affirmative defense that the claim accrued prior to the policy period.

- EB Holdings II has met its prima facie case on its breach-of-contract claim against Illinois National, subject to the $5 million antitrust sublimit and potentially to Illinois National's remaining affirmative defenses.

This case will proceed to trial on the unresolved issues of the tort claims against Illinois National and Illinois National's affirmative defenses to the breach of contract and tort claims. But first, IT IS FURTHER ORDERED that **this case is REFERRED to the magistrate judge for a mandatory settlement conference**. **The parties' obligation to file a joint pretrial order is STAYED** until 10 days after that settlement conference.

_____
U.S. District Judge Jennifer A. Dorsey
February 27, 2026